KOZINSKI, Circuit Judge,
concurring:
My colleagues in the majority and the dissent have written extensively and well. Given the exacting standard they are attempting to apply, I cannot say that either is clearly wrong. But there is something unreal about their efforts to apply the teachings of prior Supreme Court cases, all decided in very different contexts, to the plan at issue here. I hear the thud of square pegs being pounded into round holes. Ultimately, neither analysis seems entirely persuasive.
I start as did our eminent colleague Chief Judge Boudin of the First Circuit, in commenting on a highly-analogous plan adopted by the city of Lynn, Massachusetts:
[The] plan at issue in this case is fundamentally different from almost anything that the Supreme Court has previously addressed. It is not, like old-fashioned racial discrimination laws, aimed at oppressing blacks, e.g., Brown v. Bd. of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880); nor, like modern affirmative action, does it seek to give one racial group an edge over another (either to remedy past discrimination or for other purposes). E.g., Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). By contrast to Johnson v. California, — U.S. -, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005), the plan does not segregate persons by race. See also Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). Nor does it involve racial quotas. E.g., Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).
Comfort v. Lynn Sch. Comm., 418 F.3d 1, 27 (1st Cir.2005) (Boudin, C.J., concurring).
These are meaningful differences. When the government seeks to use racial classifications to oppress blacks or other minorities, no conceivable justification will be sufficiently compelling. See, e.g., Yick Wo v. Hopkins, 118 U.S. 356, 374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Similarly, when lawyers use peremptory challenges to exclude jurors of a particular race, thereby denying them the right to participate in government service, they must justify their challenges based on objective, nonracial considerations; justifications based on race will be rejected out of hand, no matter how compelling they might seem. See Batson v. Kentucky, 476 U.S. 79, 85-88, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). When government seeks to segregate the races, as in Johnson, the courts will look with great skepticism at the justifications offered in support of such programs, and will reject them when they reflect assumptions about the conduct of individuals based on their race or skin color. See Johnson, 125 S.Ct. at 1154 (Stevens, J., dissenting) (concluding that California’s policy of racially segregating inmates “supports the suspicion that the policy is based on racial stereotypes and outmoded fears about the dangers of racial integration”). When the government engages in racial gerrymandering, it not only keeps the races apart, but exacerbates racial tensions by making race a proxy for political power. See Shaw v. Reno, 509 U.S. 630, 648, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (“When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their pri *1194 mary obligation is to represent only the members of that group, rather than their constituency as a whole.”)- Programs seeking to help minorities by giving them preferences in contracting, see, e.g., Adarand, and education, see, e.g., Baklce, benign though they may be in their motivations, pit the races against each other, and cast doubts on the ability of minorities to compete with the majority on an equal footing.
The Seattle plan suffers none of these defects. It certainly is not meant to oppress minorities, nor does it have that effect. No race is turned away from government service or services. The plan does not segregate the races; to the contrary, it seeks to promote integration. There is no attempt to give members of particular races political power based on skin color. There is no competition between the races, and no race is given a preference over another. That a student is denied the school of his choice may be disappointing, but it carries no racial stigma and says nothing at all about that individual’s aptitude or ability. The program does use race as a criterion, but only to ensure that the population of each public school roughly reflects the city’s racial composition.
Because the Seattle plan carries none of the baggage the Supreme Court has found objectionable in cases where it has applied strict scrutiny and narrow tailoring, I would consider the plan under a rational basis standard of review. By rational basis, I don’t mean the standard applied to economic regulations, where courts shut their eyes to reality or even invent justifications for upholding government programs, see, e.g., Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), but robust and realistic rational basis review, see, e.g., City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), where courts consider the actual reasons for the plan in light of the real-world circumstances that gave rise to it.
Under this standard, I have no trouble finding the Seattle plan constitutional. Through their elected officials, the people of Seattle have adopted a plan that emphasizes school choice, yet tempers such choice somewhat in order to ensure that the schools reflect the city’s population. Such stirring of the melting pot strikes me as eminently sensible.
The record shows, and common experience tells us, that students tend to select the schools closest to their homes, which means that schools will reflect the composition of the neighborhood where they are located. Neighborhoods, however, do not reflect the racial composition of the city as a whole. In Seattle, “as in many other cities, minorities and whites often live in different neighborhoods.” Comfort, 418 F.3d at 29 (Boudin, C.J., concurring). To the extent that students gravitate to the schools near their homes, the schools will have the same racial composition as the neighborhood. This means that student patterns of interacting primarily with members of their own race that are first developed by living in racially isolated neighborhoods will be continued and exacerbated by the school experience.
It is difficult to deny the importance of teaching children, during their formative years, how to deal respectfully and collegially with peers of different races. Whether one would call this a compelling interest or merely a highly rational one strikes me as little more than semantics. The reality is that attitudes and patterns of interaction are developed early in life and, in a multicultural and diverse society such as ours, there is great value in developing the ability to interact successfully with individuals who are very different from oneself. It is important for the individual student, to be sure, but it is also vitally important for us as a society.
*1195 It may be true, as the dissent suggests, that students are influenced far more by their experiences in the home, church and social clubs they attend outside of school. But this does not negate the fact that time spent in school and on school-related activities, which may take up as much as half of a student’s waking hours, nevertheless has a significant impact on that student’s development. The school environment forces students both to compete and cooperate in the classroom, as well as during extracurricular activities ranging from football to forensics. Schoolmates often become friends, rivals and romantic partners; learning to deal with individuals of different races in these various capacities cannot help but foster the live-and-let-live spirit that is the essence of the American experience. I believe this is a rational objective for an educational system — every bit as rational as teaching the three Rs, advanced chemistry or driver’s education. Schools, after all, don’t simply prepare students for further education, though they certainly can and should do that; good schools prepare students for life, by instilling skills and attitudes that will serve them long after their first year of college.
To borrow Judge Boudin’s words once again, the plan here is “far from the original evils at which the Fourteenth Amendment was addressed.... This is not a case in which, against the background of core principles, all doubts should be resolved against constitutionality.” Comfort, 418 F.3d at 29 (Boudin, C.J., concurring). I am acutely mindful of the Supreme Court’s strong admonition only last Term that any and all racial classifications must be adjudged under the strict scrutiny standard of review. See Johnson, 125 S.Ct. at 1146 (citing eases). But the Supreme Court’s opinions are necessarily forged by the cases presented to it; where the case at hand differs in material respects from those the Supreme Court has previously decided, I would hope that those seemingly categorical pronouncements will not be applied without consideration of whether they make sense beyond the circumstances that occasioned them.
When the Supreme Court does review the Seattle plan, or one like it, I hope the justices will give serious thought to bypassing strict — and almost always deadly — scrutiny, and adopt something more akin to rational basis review. Not only does a plan that promotes the mixing of races deserve support rather than suspicion and hostility from the judiciary, but there is much to be said for returning primacy on matters of educational policy to local officials. Long past is the day when losing an election or a legislative vote on a hotly contested issue was considered the end of the matter — at least until the next election when the voters might “throw the rascals out.” Too often nowadays, an election or a vote is a mere precursor to litigation, with the outcome of the dispute not known until judges decide the case many years later.
Whatever else the strict scrutiny standard of review may do, it most certainly encourages resort to the courts and often delays implementation of a program for years. The more complex and exacting the. standard of review, the more uncertain the outcome, and the greater are the incentives for the parties to bloat the record with depositions, expert reports, exhibits, documents and various other materials they hope will catch the eye of the judges who ultimately decide the issue. This is a perfectly fine example, the litigation having taken over five years so far, generating 11 published opinions from the 24 judges who have considered the matter in the federal and state courts. In the meantime, the plan was put on hold, and at least one class has entered and will have completed its entire high school career without ever being affected by it.
*1196 While it’s tempting to adopt rules of law that give us the ultimate say on hotly contested political questions, we should keep in mind that we are not infallible, nor are we the repository of ultimate wisdom. Elected officials, who are much closer to ground zero than we are — and whose political power ebbs and flows with the approval of the voters — understand the realities of the situation far better than we can, no matter how many depositions and expert reports we may read in the quiet of our chambers. It therefore behooves us to approach issues such as those presented here with a healthy dose of modesty about our ability to understand the past or predict the future. It should make us chary about use of the strict scrutiny standard of review, which proclaims us the ultimate arbiters of the issue and gives those who oppose the policy in question every incentive to turn litigation, to paraphrase Clausewitz, into a continuation of politics by other means.
To resort to Chief Judge Boudin’s words one last time, “we are faced with a local experiment, pursuing plausible goals by novel means that are not squarely condemned by past Supreme Court precedent. The problems that the ... plan addresses are real, and time is more likely than court hearings to tell us whether the solution is a good one.... ” Comfort, 418 F.3d at 29 (Boudin, C.J., concurring). I share Judge Boudin’s preference for resolving such difficult issues by trial and error in the real world, rather than by experts jousting in the courtroom. When it comes to a plan such as this — a plan that gives the American melting pot a healthy stir without benefiting or burdening any particular group — I would leave the decision to those much closer to the affected community, who have the power to reverse or modify the policy should it prove unworkable. It is on this basis that I would affirm the judgment of the district court.
BEA, Circuit Judge,
with whom Circuit Judges KLEINFELD, TALLMAN and CALLAHAN join dissenting:
I respectfully dissent.
At the outset, it is important to note what this case is not about. The idea that children will gain social, civic, and perhaps educational skills by attending schools with a proportion of students of other ethnicities and races, which proportion reflects the world in which they will move, is a notion grounded in common sense. It may be generally, if not universally, accepted.[1] But that is not the issue here. The issue here is whether this idea may be imposed by government coercion, rather than societal conviction; whether students and their parents may choose, or whether their government may choose for them.[2]
In the Seattle School District (“District”), some schools are oversubscribed *1197 and in higher demand than others, so the District uses a tiebreaker to assign some ninth-grade students, and not others, to those schools. The tiebreaker operates solely on the basis of the student’s race. In fact, rather than differentiating between African-American, Asian-American, Latino, Native American, or Caucasian students, the tiebreaker classifies students only as “white” or “nonwhite.”[3] The District seeks a racially balanced student body of 40% white, 60% nonwhite children; the tiebreaker excludes white or nonwhite students from an oversubscribed school if their admission will not further that preferred ratio.
Notwithstanding the majority’s fervent defense of that plan, the District is engaged in simple racial balancing, which the Equal Protection Clause forbids. The majority can arrive at the opposite conclusion only by applying a watered-down standard of review — improperly labeled “strict scrutiny” — which contains none of the attributes common to our most stringent standard of review. I respectfully disagree with the majority’s gentle endorsement of the racial tiebreaker and would instead hold the District violates the Equal Protection Clause whenever it excludes a student from a school solely on the basis of race.
I.
As an introductory note, I call attention to the majority’s frequent misuse of the terms “segregation,” “segregated schools,” and “segregated housing patterns.” See, e.g., Majority op. at 1166, 1167. As a perfectly understandable rhetorical ploy, the majority continually uses those charged terms when there has been no such segregation in the Seattle schools in any textual or legal sense.[4] Throughout the desegregation cases, the U.S. Supreme Court stated that only the remediation of de jure segregation justified the use of racial classifications. Freeman v. Pitts, 503 U.S. 467, 494, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). “[T]he differentiating factor between de jure segregation and so-called de facto segregation ... is purpose or intent to segregate.” Keyes v. School Dist. No. 1, 413 U.S. 189, 208, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) (emphasis in original); see Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 17, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (“ ‘Desegregation’ means the assignment of students to public schools and within such schools without regard to their race, color, religion, or national origin, but ‘desegregation’ shall not mean the assignment of students to public schools in order to overcome racial imbalance.”) (emphasis added).
“Segregate” is a transitive verb. It requires an actor to do an act which effects segregation. See OxfoRD English DICTIONARY (2d ed.1989) (“segregate, v. 1. a. trans.: To separate (a person, a body or class of persons) from the general body, or from some particular class; to set apart, isolate, seclude”).[5] Instead of de jure segregation, what the majority describes is racial imbalance in the District’s schools and Seattle’s residential makeup.
*1198 Of course, it is much easier to argue for measures to end “segregation” than for measures to avoid “racial imbalance.” Especially is this so in view of the U.S. Supreme Court’s frequent pronouncements that “racial balancing” violates the Equal Protection Clause. See Grutter v. Bollinger, 539 U.S. 306, 330, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (“[Ojutright racial balancing ... is patently unconstitutional.”); Freeman, 503 U.S. at 494, 112 S.Ct. 1430 (“Racial balance is not to be achieved for its own sake.”); Regents of the Univ. of Calif v. Bakke, 438 U.S. 265, 307, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Powell, J.) (“If petitioner’s purpose is to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin, such a preferential purpose must be rejected not as insubstantial but as facially invalid. Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids.”).
It should be remembered by the reader of the majority opinion that one can no more “segregate” without a person actively doing the segregation than one can separate an egg without a cook.
Like Judge Boudin,[6] in his concurring opinion Judge Kozinski tries to distinguish past Supreme Court cases involving racial discrimination by focusing on the effects of the discrimination, rather than the fact of the discrimination.
This creates for them two categories different from the effects of the Seattle plan: (1) the effects of other race discrimination plans were much worse than Seattle’s and (2) the effects were visited on certain races.
But the difference reflected in these two categories are irrelevant. “[Tjhere is no de minimis exception to the Equal Protection Clause. Race discrimination is never a ‘trifle.’ ” Monterey Mechanical Co. v. Wilson, 125 F.3d 702, 712 (9th Cir.1997). Second, the Fourteenth Amendment protects individual rights, not the rights of certain races or groups.
Further, that a “plan does not segregate persons by race”[7] does not justify it in refusing school admission to a qualified scholar because he does not belong to a particular race. There was no segregation by race at Cal Davis medical school, when Bakke was improperly refused admission. See Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750.
Also, it is quite accurate to say the Seattle plan does not “involve racial quotas.” [8] The numerical quota is the percentage by which the school in question’s racial composition differs from the school district’s target.[9] Not calling it a quota, does not make it something other. “A rose by any other name ... etc.”
Perhaps the Supreme Court will adopt a “rational relation” basis for review of race-based discrimination by government, based on the concurrence’s view of what is “realistic” or what are “real-world circumstances.” [10] As indicated above, however, it certainly has given no such indication.[11] *1199 But if it does, one doubts that it will do so based on a “melting pot” metaphor.
Up to now, the American “melting pot” has been made up of people voluntarily coming to this country from different lands, putting aside their differences and embracing our common values. To date it has not meant people who are told whether they are white or non-white, and where to go to school based on their race.
The suggestion that local political forces should decide when to employ racial discrimination in the allocation of governmental resources is certainly nothing new in American history. Such “local option” discrimination was adopted in the Missouri Compromise of 1820, which established the Mason-Dixon line, and the Compromise of 1850. But since then, the Civil War, the post-war Amendments to the Constitution and Brown v. Bd. of Ed. of Topeka, Shawnee County, Kan., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) have made racial discrimination a matter of national concern and national governance.
As noted in the opening lines of this dissenting opinion, it certainly is rational to believe that racial balancing in schools achieves better racial socialization and, as a result, better citizens. The issue is not that, but whether what is rational can be achieved by compulsory racial discrimination by the State.
II.
I agree with the majority that the District’s use of the racial tiebreaker is a racial classification, and all racial classifications are subject to “strict scrutiny” review under the Equal Protection Clause. See Majority op. at 1173. Yet the majority conceives of strict scrutiny as some type of relaxed, deferential standard of review. I view it differently.
“No State shall ... deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const., amend. XIV, § 1. The right to equal protection is an individual one, and so where federal or state governments classify a person according to race — “a group classification long recognized as in most circumstances irrelevant and therefore prohibited” — we review such state action under the most “detailed judicial inquiry”' — -that is, under strict scrutiny. Grutter, 539 U.S. at 326, 123 S.Ct. 2325; see Miller v. Johnson, 515 U.S. 900, 911, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (“At the heart of the Constitution’s guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.)” (internal quotation marks omitted).
The right to equal protection is held equally among all individuals. “[A]ll racial classifications renewable under the Equal Protection Clause must be strictly scrutinized.” Adarand, 515 U.S. at 224, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (emphasis added). Strict scrutiny applies regardless whether the racial classifications are invidious or benign and “is not dependent on the race of those burdened or benefited by a particular classification.” Gratz, 539 U.S. at 270, 123 S.Ct. 2411; see Johnson, 125 S.Ct. at 1146 (“We have insisted on strict scrutiny in every context, even for so-called ‘benign’ racial classifications, such as race-conscious university admissions policies, race-based preferences in government contracts, and race-based districting intended to improve minority representation.”) (internal citations omitted). We require such a demanding inquiry “to ‘smoke out’ illegitimate uses of race by assuring *1200 that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool.” Adarand, 515 U.S. at 226, 115 S.Ct. 2097.
The right to equal protection provides a liberty; it represents freedom from government coercion based upon racial classifications. See Miller, 515 U.S. at 904, 115 S.Ct. 2475 (the Equal Protection Clause’s “central mandate is racial neutrality in governmental decisionmaking”). Thus, under strict scrutiny, all racial classifications by the government, regardless of purported motivation, are “inherently suspect,” Adarand, 515 U.S. at 223, 115 S.Ct. 2097, and “presumptively invalid,” Shaw v. Reno, 509 U.S. 630, 643-44, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). They are permissible only where the government proves their use is “narrowly tailored to further compelling governmental interests.” Grutter, 539 U.S. at 326, 123 S.Ct. 2325.
It follows, then, that the government carries the burden of proving that its use of racial classifications satisfies strict scrutiny. Johnson, 125 S.Ct. at 1146 n. 1 (“We put the burden on state actors to demonstrate that their race-based policies are justified.”); Gratz, 539 U.S. at 270, 123 S.Ct. 2411; W. States Paving Co., Inc. v. Wash. State Dep’t of Transp., 407 F.3d 983, 990 (9th Cir.2005) (“The burden of justifying different treatment by ethnicity ... is always on the government.”) (quoting Monterey Mech Co. v. Wilson, 125 F.3d 702, 713 (9th Cir.1997)).
Despite this formidable standard of review, the majority does not hesitate to endorse the District’s use of the racial tiebreaker. Rather than recognizing the protections of the individual against governmental racial classifications, the majority instead endorses a rigid racial governmental grouping of high school students for the purpose of attaining racial balance in the schools. For the reasons expressed below, I do not share in the majority’s confidence that such a plan is constitutionally permissible.
III.
I consider first whether the District has asserted a “compelling governmental interest,” the first element of the strict scrutiny test. The District contends it has a valid compelling governmental interest in using racial balancing to achieve “the educational and social benefits of racial ... diversity” within its high schools and avoid “racially concentrated” schools. The District argues its interest will enhance student discussion of racial issues in high school and will foster cross-racial socialization and understanding, both in school and later in the students’ lives.
The U.S. Supreme Court has “declined to define compelling interest or to tell [the lower courts] how to apply that term.” Hunter v. Regents of the Univ. of Calif, 190 F.3d 1061, 1070 n. 9 (9th Cir.1999) (Beezer, J., dissenting); Mark R. Killenbeck, Pushing Things Up to Their First Principles: Reflections on the Values of Affirmative Action, 87 Calif. L.Rev. 1299, 1349 (1999) (the definition of a compelling interest “is admittedly imprecise. The Supreme Court has never offered a workable definition of the term ... and is unlikely ever to do so, preferring to approach matters on a case-by-case basis”).
The majority is correct in noting the U.S. Supreme Court has never endorsed “racial balancing” as a “compelling interest.” Indeed, throughout the history of strict scrutiny, the Supreme Court has rejected as invalid all such asserted compelling interests, save for two exceptions. With respect, the majority errs in creating a third.
A.
The Court has endorsed two race-based compelling governmental interests in the public education context. First, the Court *1201 has allowed racial classifications to remedy-past racial imbalances in schools resulting from past de jure segregation. Freeman, 503 U.S. at 494, 112 S.Ct. 1480. Second, the Court has allowed undergraduate and graduate universities to consider race as part of an overall, flexible assessment of an individual’s characteristics to attain student body diversity. Grutter, 539 U.S. at 328, 123 S.Ct. 2325; Gratz, 539 U.S. at 268-69, 123 S.Ct. 2411.
Besides those two valid compelling interests, the Court has struck down every other asserted race-based compelling interest that has come before it. See Shaw v. Hunt, 517 U.S. 899, 909-12, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) (rejecting racial classifications to “alleviate the effects of societal discrimination” in the absence of findings of past discrimination, and to promote minority representation in Congress); Richmond v. J.A. Croson Co., 488 U.S. 469, 511, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (plurality) (rejecting racial classifications in the awarding of public construction contracts in the absence of findings of past discrimination); Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 274-76, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (rejecting racial classifications in a school district’s teacher layoff policy when offered as a means of providing minority role models for its minority students and as a means of alleviating past societal discrimination); Bakke, 438 U.S. at 310-11, 98 S.Ct. 2733 (Powell, J.) (rejecting the application of race-conscious measures to improve “the delivery of health-care services to communities currently under-served”). A crucial guiding point here— and one elided entirely by the majority — is the Court’s consistent reiteration that “outright racial balancing ... is patently unconstitutional.” See, e.g., Grutter, 539 U.S. at 330, 123 S.Ct. 2325.
Thus, we face a landscape littered with rejected asserted “compelling interests” requiring race-based determinations, but with two exceptions still standing. The first exception is inapplicable here because the Seattle schools have never been de jure segregated. See Freeman, 503 U.S. at 494, 112 S.Ct. 1430.
The second exception is also inapplicable, albeit not so directly acknowledged. At oral argument, the District conceded that it is not asserting the Grutter “diversity” interest; the majority recognizes this in stating the District’s asserted interest is “significantly different” in some ways from the interest asserted in Grutter. Majority op. at 1176. Nonetheless, the majority concludes those differences are inconsequential because of the different “context” [12] between high schools and universi *1202 ties, and the District’s asserted interest is a compelling governmental interest in its own right.
Not so. The very differences between the Grutter “diversity” interest and the District’s asserted interest illustrate why the latter violates the Equal Protection Clause as opposed to the former. The Grutter “diversity” interest focuses upon the individual, of which race plays a part, but not the whole. The District’s asserted interest, however, focuses only upon race, running afoul of equal protection’s focus upon the individual.
B.
In Grutter and Gratz, the Court made clear that the valid compelling interest in “diversity” does not translate into a valid compelling interest in “racial diversity.” The “diversity” interest
is not an interest in simple ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups .... Rather, the diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element.
Grutter, 539 U.S. at 324-25, 123 S.Ct. 2325 (emphasis added); see Gratz, 539 U.S. at 272-73, 123 S.Ct. 2411 (“[T]he critical criteria [in a permissible race-conscious admissions program] are often individual qualities or experiences not dependent upon race but sometimes associated with it.”).
The Grutter “diversity” interest focuses upon the individual, which can include the applicant’s race, but also includes other factors, such as the applicant’s family background, her parent’s educational history, whether she is fluent in other languages, whether she has overcome adversity or hardship, or whether she has unique athletic or artistic talents. See 539 U.S. at 338, 123 S.Ct. 2325. Such a focus is consistent with the Equal Protection Clause, which protects the individual, not groups.
But here, the District’s operation of the racial tiebreaker does not consider the applicant as an individual. To the contrary, the racial tiebreaker considers only whether the student is white or nonwhite. While the Grutter “diversity” interest pursues genuine diversity in the student body (of which race is only a single “plus” factor), the District pursues an interest which considers only racial diversity, i.e., a predefined grouping of races in the District’s schools.[13] Such an interest is not a valid *1203 compelling interest; it is simple racial balancing, forbidden by the Equal Protection Clause. See id. at 330, 123 S.Ct. 2325 (stating a government institution’s interest “to assure within its student body some specified percentage of a particular group merely because of its race ... would amount to outright racial balancing, which is patently unconstitutional”).
Grutter emphasized the dangers resulting from lack of an individualized consideration of each applicant. Observing that the Michigan Law School sought an unquantified “critical mass” of minority students to avoid only token representation, rather than some defined balance, id. at 330, 123 S.Ct. 2325, the Court reasoned the law school’s individualized focus on students forming that “critical mass” would avoid perpetuating the stereotype that all “minority students always ... express some characteristic minority viewpoint on any issue,” id. at 333, 123 S.Ct. 2325.
But here, the District’s concept of racial diversity is a predetermined, defined ratio of white and nonwhite children. The racial tiebreaker works to exclude white students from schools that have a 50-55% white student body (depending on the tiebreaker trigger used in a particular year), and works to exclude nonwhite students from schools with a 70-75% nonwhite student body (depending on the tiebreaker trigger used). Thus, the District’s concept of racial diversity does not permit a school with a student body that is too white, or a school with a student body that is too nonwhite.
The District argues its concept of racial diversity is necessary to foster classroom discussion and cross-racial socialization. That argument, however, is based on the stereotype that all white children express traditional white viewpoints and exhibit traditional white mannerisms; all nonwhite children express opposite nonwhite viewpoints and exhibit nonwhite mannerisms, and thereby white and nonwhite children will better understand each other. Yet there is nothing in the racial tiebreaker to ensure such viewpoints and mannerisms are represented within the preferred student body ratio. As noted in Grutter, the only way to achieve diverse viewpoints and mannerisms is to look at the individual student. White children have different viewpoints and backgrounds than other white children; the same goes for nonwhite children; and some white children have the same viewpoints and backgrounds as some nonwhite children. The assumption that there is a difference between individuals just because there is a difference in their skin color is a stereotype in itself, nothing more.[14]
The District also claims it must use the racial tiebreaker to avoid racially imbalanced schools, which may result in schools with large white or nonwhite student bodies and in which the supposed benefits from the District’s concept of racial diversity will not occur. This theory, however, presents another racial stereotype, which assumes there is something wrong with a school that has a heavy nonwhite student body population, or something better *1204 about a school that has a heavy white student body population. See Missouri v. Jenkins, 515 U.S. 70, 122, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (Thomas, J., concurring) (“After all, if separation itself is a harm, and if integration therefore is the only way that blacks can receive a proper education, then there must be something inferior about blacks. Under this theory, segregation injures blacks because blacks, when left on their own, cannot achieve. To my way of thinking, that conclusion is the result of a jurisprudence based upon a theory of black inferiority.”).
Besides the District’s reliance on racial stereotypes, there is good reason categorically to forbid racial balancing. The process of classifying children in groups of color, rather than viewing them as individuals, encourages “notions of racial inferiority” in both white and nonwhite children and incites racial hostility. See Grutter, 539 U.S. at 328, 123 S.Ct. 2325. Indeed, those risks are particularly great here because of the blunt nature of the racial tiebreaker. The District’s racial grouping of students, either as white or nonwhite, assumes that each minority student is the same, regardless whether he is African-American, Asian-American, Latino, or Native American; the only difference noted by the District is that the minority student is not white.[15] The District thus “conceives of racial diversity in simplistic terms as a dichotomy between white and nonwhite, as if to say all nonwhites are interchangeable.” Parents Involved in Cmty. Schs. v. Seattle Sch. Dist, No. 1, 149 Wash.2d 660, 72 P.3d 151, 169 n. 5 (2003) (Sanders, J., dissenting). I join my colleague on the Washington Supreme Court in observing that “[a]s a theory of racial politics, this view is patently offensive and as a policy to promote racially diverse schools, wholly inadequate.” Id.
Unlike a voluntary decision by parents to expose their children to individuals of different races or background, the District classifies each student by skin color and excludes certain students from particular schools — solely on the basis of race — to ensure those schools remain racially balanced. Even if well-intentioned, the District’s use of racial classifications in such a stark and compulsory fashion risks perpetuating the same racial divisions which have plagued this country since its founding:
Race is perhaps the worst imaginable category around which to organize group competition and social relations more generally. At the risk of belaboring the obvious, racial categories in law have played an utterly pernicious and destructive role throughout human history. This incontrovertible fact should arouse wonder ... at the hubris of those who imagine that we can distinguish clearly enough between invidious and benign race discrimination to engrave this distinction into our constitutional order. Vast human experience mocks this comforting illusion, as does the fact that most Americans, including many minorities, think racial preferences are invidious, not benign. Whether benignly intended or not, using the category of race — which affirmative action proponents oddly depict as socially constructed and primordial and immutable — to *1205 distribute advantage and disadvantage tends to ossify the fluid, forward-looking political identities that a robust democratic spirit inspires and requires.
Peter H. Schuck, Affirmative Action: Past, Present, and Future, 20 Yale L. & Pol’y Rev. 1, 92-93 (2002).
We should not minimize these shadows that are cast over the supposed benefits of the District’s asserted interest. The District’s stark racial classifications not only offend intrinsic notions of individuality, they even suggest principles opposite to what the District claims to seek. Although the District contends it uses the racial tiebreaker for good, i.e., to foster cross-racial socialization and understanding, the District’s concept of racial diversity also suggests other principles which many may find objectionable, especially when taught to children:
While a public law preference does express a certain kind of compassion for and commitment to the preferred groups, other signals dominate its message — among them, that American society thinks it just to group people by race and ethnicity, to treat those groups mon-olithieally, and to allocate precious resources and opportunities accordingly; that it holds equal treatment and individual merit as secondary, dispensable ideals; that the preferred groups cannot succeed without special public favors; that such favors do not stigmatize them in the minds of fair-minded others; that those who oppose preferences thereby oppose the aspirations of the preferred groups; and that society can assuage old injustices by creating new ones. When public law says such things, it speaks falsely, holds out vain promises, and brings itself into disrepute.
Id. at 87-88.
The District’s asserted interest may be supported by noble goals. But the stereotypes on which it is based, and the risks that it presents, make that interest far from compelling.
C.
The sociological evidence presented by the District, relied upon strongly by the majority, does not change my view. The majority discusses much of the evidence that supports the District’s position that racially balanced schools foster cross-racial socialization and understanding in school and later in the students’ lives. Majority op. at 1174 -1175. Yet the majority puts aside the other evidence suggesting there is no definitive agreement as to the beneficial effects of racial balance in K-12 schools, that the benefits attributed to racially balanced schools are often weak, and that any benefits do not always have a direct correlation to racial balance. Yet again, a private citizen is free to accept one body of opinion and reject another in deciding to send his child to a particular school. Is the state similarly privileged when required to determine that its claimed goal is a “compelling interest”? One would think that to be “compelling” there would be no room for doubt of the need for the measure. That is certainly not the case here.
For example, a source provided by the District states that “family background has a significantly stronger effect on student achievement than any other single school factor or constellation of school factors, including school racial and ethnic composition.” [SER 182.] Another source presented by the District states that court-ordered desegregation (ie., a court-ordered breakup of a de jure segregated student body) resulted in only minimal benefits:
[Research suggests that desegregation has had some positive effect on the reading skills of African American youngsters. The effect is not large, nor does it occur in all situations, but a modest measurable effect does seem apparent. *1206 Such is not the case with mathematical skills, which seem generally unaffected by desegregation. Second, there is some evidence that desegregation may help to break what can be thought of as a generational cycle of segregation and racial isolation. Although research on this topic is scant and often marred by unavoidable flaws, evidence has begun to accumulate that desegregation may favorably influence such adult outcomes as college graduation, income, and employment patterns. The measured effects are often weak ....
[SER 205, 207-208.]
That source concludes that “[t]he evidence regarding the impact of desegregation on intergroup relations is generally held to be inconclusive and inconsistent.” [SER 208.]. See Grutter, 539 U.S. at 364-65, 123 S.Ct. 2325 (Thomas, J., dissenting) (collecting studies suggesting black students perform at higher levels of achievement at historically black colleges); David I. Levine, Public School Assignment Methods after Grutter and Gratz: The View from San Francisco, 30 Hastings Const. L.Q. 511, 536 (2003) (noting that a high school’s focus on racial balance misses the “key element” in the context of education, i.e., that “the life chances of students are improved only with economic integration”).[16]
The serious risks presented by racial classifications counteract the marginal benefits provided by racial balancing. Courts have long recognized racial classifications promote “notions of racial inferiority and lead to a politics of racial hostility.” See Grutter, 539 U.S. at 328, 123 S.Ct. 2325; Michael Perry, Modern Equal Protection, 79 Colum. L.Rev. 1023, 1048 (1979) (“Affirmative action “ ‘inevitably foments racial resentment and thereby strains the effort to gain wider acceptance for the principle of moral equality of the races.’ ” ”). Other studies suggest that where racial classifications are a means of achieving racial balance, academic achievement by minorities is hindered, and racial tensions are riled:
In a culture that ardently affirms the principles of individual freedom, merit, and equality of opportunity, [the] demoralization and anger [precipitated by being victim to government-imposed racial classifications] must be counted as a very large social cost. It is no less a *1207 cost because it is borne by whites, and often less privileged whites at that. If these principles make it unfair to impose this cost, the fact that the unfairness is spread across a large group of people may not make it any more palatable. In fact, diffusing the unfairness in this way will simply increase the number of people who feel themselves aggrieved.
Schuck, supra, at 69.
But despite the inconsistencies in the sociological evidence and the vivid risks of the District’s asserted interest, the majority implicitly defers to the District’s position. Grutter took a similar approach, emphasizing that its endorsement of the “diversity” interest relied in large part upon deference to the educational judgment of the Michigan Law School. 539 U.S. at 330, 123 S.Ct. 2325.
Yet perhaps to steal a line from the majority, the “context” here is different. We are not faced with a university’s “academic freedom,” which arises from “a constitutional dimension, grounded in the First Amendment, of educational autonomy,” and which includes the freedom to select its student body. Id. We instead consider a public high school’s admissions plan which admits or excludes students from particular schools solely on the basis of their race. For several reasons, we should not defer to such a plan.
First, other than for race-conscious university admissions based on holistic diversity, deference to a government actor is inconsistent with strict scrutiny. See Johnson, 125 S.Ct. at 1146 n. 1 (stating generally that “deference [by the courts in applying strict scrutiny] is fundamentally at odds with our equal protection jurisprudence”); id. at 1150 (stating the Supreme Court has “refused to defer to state officials’ judgments on race ... where those officials traditionally exercise substantial discretion.”). In Grutter, the Court- deferred to the Michigan Law School’s “diversity” interest because of the law school’s “academic freedom” — grounded in the First Amendment and including the law school’s freedom to select its own student body — and the law school’s asserted need for diversity to achieve a “robust exchange of ideas” within its classrooms, a vital part of the law school’s mission. 539 U.S. at 330, 123 S.Ct. 2325.
None of those same issues are implicated here. The “academic freedom” of a university allows it “to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.” Bakke, 438 U.S. at 312, 98 S.Ct. 2733 (Powell, J.). High schools do not have such similar freedoms. They cannot determine who may teach, at least when that determination is based upon racial grounds. See Wygant, 476 U.S. at 274-76, 106 S.Ct. 1842. They also cannot determine who may be admitted to study; when the government chooses to provide public education in secondary schools, it “must be made available to all on equal terms.” See Plyler v. Doe, 457 U.S. 202, 221-23, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). Further, there is no comparable line of U.S. Supreme Court cases affording high schools the special “[A]cademie freedom[s]” granted to universities by the First Amendment. See United States v. Fordice, 505 U.S. 717, 728-29, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992) (“a state university system is quite different in very relevant respects from primary and secondary schools.”); Jay P. Lechner, Learning From Experience: Why Racial Diversity Cannot Be a Legally Compelling Interest in Elementary and Secondary Education, 32 SW. U.L.Rev. 201, 215 (2003) (stating the Supreme Court “has been less deferential to the discretion of elementary or secondary school officials in Equal Protection cases, in part because the Court has viewed school desegregation as serving social rather than educational goals. The Court has acknowledged that *1208 even the most important, delicate, and highly discretionary functions of state educators are subject to the limits of the Bill of Rights and subordinate to the Constitutional freedoms of the individual. Moreover, the educational benefits from diversity, if any, are much greater at the higher educational level because such benefits are greatly magnified by the learning that takes place outside the classroom — in dormitories, social settings, and extracurricular activities — as students must learn to live and work with persons of other races and ethnic backgrounds.”) (internal quotation marks omitted).
Moreover, there is a crucial difference between the “robust exchange of ideas” theory referenced in Grutter and the District’s claim that its interest “brings different viewpoints and experiences to classroom discussions and thereby enhances the educational process.” [ER 237.] The District applies the racial tiebreaker only to entering ninth-grade students. [ER 253, 308.] It is self-evident that classroom discussion plays a significantly more vital role in universities with their typical dialectic or Socratic teaching method, than in ninth-grade high school courses with their typical didactic or rote teaching method.
Last, the District’s claim that its asserted interest helps to foster cross-racial socialization and understanding later in the students’ lives is a sociological judgment outside the expertise of the District’s educators. Those external benefits are diffuse, manifest long after students leave the classroom, and cannot be measured with skills possessed uniquely by educators. Unlike Grutter, which deferred to the Law School on the basis that diversity in the classroom was vital to its educational mission during the three-year law school curriculum, here, the District’s asserted interest depends upon benefits only loosely linked to the District’s educational mission and to take effect years after its schooling of the children, or entirely outside the expertise of its educators. Here, high school administrators and teachers are predicting what sociologists will find years later.
Strict scrutiny cannot remain strict if we defer to judgments not even within the particular expertise or observation of the party being scrutinized. Hence, deference is not due to the District regarding the benefits the District contends are attributable to its claimed interest.[17]
*1209 In the absence of deference to the District’s sociological evidence, the faults of the District’s asserted interest come into sharper focus. It has none of the saving graces present in the Grutter holistic diversity interest. It perpetuates racial stereotypes and risks fomenting racial hostility. Last, the District enforces the interest through government compulsion in the starkest black and white terms, espousing the principle that race trumps the individual.
The sociological evidence presented by the' District suggests that some benefits will accrue from racial balancing. To me, evidence of some benefits does not satisfy the District’s burden of proving a compelling governmental interest, especially in light of the Supreme Court’s frequent pronouncements that racial balancing itself is unconstitutional. Thus, viewed under the lens of strict scrutiny, and without the deference invoked in Grutter, the District’s interest is simply not a compelling governmental interest. Hence, I would hold that the District’s operation of the racial tiebreaker is an impermissible racial classification and violates the Equal Protection Clause.
IV.
Even if the District’s asserted interest were a compelling governmental interest, the means used by the District must still be narrowly tailored to serve that interest. See Grutter, 539 U.S. at 333, 123 S.Ct. 2325. For argument’s sake, I here assume, without conceding, the District has asserted a valid compelling governmental interest in using racial balancing to achieve “the educational and social benefits of racial ... diversity” within its high schools and to avoid “racially concentrated” schools. Yet even under that assumption, the District’s use of the racial tiebreaker is not narrowly tailored to serve that interest.
The majority notes that Grutter set forth “five hallmarks of a narrowly tailored affirmative action plan: (1) individualized consideration of applicants; (2) the absence of quotas; (3) serious, good-faith consideration of race-neutral alternatives to the affirmative action program; (4) that no member of any racial group was unduly harmed; and (5) that the program had a sunset provision or some other end point.” Majority op. at 1180. I agree with that general formulation. Yet the majority’s application of those factors again evinces an improper deference to the District; such deference is ill suited for the searching inquiry needed under the narrow-tailoring prong of strict scrutiny. See Johnson, 125 S.Ct. at 1146 n. 1. I consider below whether the District’s use of the racial tiebreaker is narrowly tailored to its asserted interest, and conclude that racial tiebreaker is not narrowly tailored.
*1210 A.
The first narrow-tailoring factor requires the District to engage in an individualized consideration of each applicant’s characteristics and qualifications. See Grutter, 539 U.S. at 337, 123 S.Ct. 2325. The importance of this factor is self-evident; individualized consideration serves the primary purpose of the Equal Protection Clause, which protects the individual from group classifications, especially those by race. See id. at 326, 123 S.Ct. 2325.
Yet the majority concludes that individualized consideration of each applicant is irrelevant here “because of the contextual differences between institutions of higher learning and public high schools.” Majority op. at 1180. I could not disagree more.[18] By removing consideration of the individual from the narrow tailoring analysis, the majority threatens to read the Equal Protection Clause out of the Constitution. It is the very nature of equal protection to require individualized consideration when the government uses racial classifications: “the Fourteenth Amendment “protects persons, not groups.” ” Grutter, 539 U.S. at 326, 123 S.Ct. 2325 (quoting Adarand, 515 U.S. at 227, 115 S.Ct. 2097) (emphasis in original). Grutter emphasized the importance of the individualized consideration of each applicant: in the context of a race-conscious university admissions program, such consideration
must remain flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant’s race or ethnicity the defining feature of his or her application. The importance of this individualized consideration in the context of a race-conscious admissions program is paramount.
Id. at 337, 123 S.Ct. 2325 (emphasis added). The differences between university and secondary education do not justify denial of individualized equal protection of the law to secondary school students.
Individualized consideration of an applicant does not require an admissions program to be oblivious to race; the program may consider race, but in doing so, it must remain “flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight.” Id. at 334, 123 S.Ct. 2325. There can be “no policy, either de jure or de facto, of automatic acceptance or rejection based on any single ‘soft’ variable ... [such as the awarding of] mechanical, predetermined diversity ‘bonuses’ based on race or ethnicity.” Id. at 337, 123 S.Ct. 2325.
Here, the racial tiebreaker works to admit or exclude high school students from certain oversubscribed schools solely on the basis of their skin color. No other consideration affects the operation of the racial tiebreaker; when it operates, it operates to admit or exclude either a white or nonwhite student, depending upon how the admission will affect the preferred balance at the oversubscribed school. Such a program is precisely what Grutter warned against, and what Gratz held unconstitutional: a mechanical, predetermined policy “of automatic acceptance or rejection based on a[] single ‘soft’ variable,” that being the student’s skin color. See id.
The racial tiebreaker’s overbroad classification of students as “white” or “nonwhite” also runs counter to the required individualized consideration of each applicant. The District does not even consider the student’s actual race. Instead, the *1211 District presumably places all Caucasian students into the “white” category, and then places all African-American, Latino, Asian-Ameriean, Pacific Islander and Native Americans into the “nonwhite” category. This puts aside the categorization of any individuals whose skin color does not correlate directly with the classifications. Although parents and students may identify their particular group on the registration materials, if they do not, the District will make the racial identification itself through visual inspection of the parent or student. Thus, a fair-skinned minority may wind up in the “white” category, or a darker-skinned Caucasian may wind up in the “nonwhite” category.
Courts have often recognized that the inclusion of all minorities within a “nonwhite” classification suggests the operation of a racial classification is not narrowly tailored. See Wygant, 476 U.S. at 284 n. 13, 106 S.Ct. 1842 (noting the “definition of minority to include blacks, Orientals, American Indians, and persons of Spanish descent further illustrates the undifferentiated nature of the plan”); Monterey Mech. Co., 125 F.3d at 714 (noting the inclusion of all minority races within a broad “minority” category serves as a “red flag[] signaling that the statute is not, as the Equal Protection Clause requires, narrowly tailored”). At the very least, a narrowly tailored program would require an individualized focus which would separate the student according to his or her correct race, rather than as a process of simple pigmental matching.
The majority concludes, however, that individualized consideration of each applicant is unnecessary because the District does not exclude any student from a public education by operation of the racial tiebreaker. The majority reasons that because all students are entitled to a public education in one of the District’s schools, there is no competition in the District for admission to any of those schools, and thus no racial stigma could attach when a student is excluded from admission to one of the schools on the basis of his race. Majority op. at 1181-1182.
Yet the majority offers no explanation why, in the 2000-01 school year, 82% of the students selected one of the oversubscribed schools (i.e., the schools subject to the racial tiebreaker) as their first choice, while only 18% picked one of the under-subscribed schools as their first choice. Majority op. at 10-11. Clearly, the students’ and their parents’ “market” appraise some of the schools as providing a better education than the others. Even the District’s superintendent confirmed that the students’ parents considered some of the schools to be of higher quality. [ER 534.]
It is common sense that some public schools are better than others. Parents often move into areas offering better school districts, and ubiquitous research guides compare the quality of public schools according to standardized test scores, program offerings, and the sort. It may be that soothing, if self-interested, bureaucratic voices sing a lullaby of equal educational quality in the District’s schools. But the facts show that parents and children have voted with their feet in choosing some schools rather than others. The verdict of that “market” makes a hash out of such assurances by the District.
Thus, the District’s operation of the racial tiebreaker in reality does limit access to a governmental benefit among certain students. The District insulates applicants belonging to certain racial groups from competition for admission to those schools perceived to be of higher quality. A narrowly tailored race-conscious admissions program “cannot insulate each category of applicants with certain desired [racial] qualifications from competition with all other applicants.” Grutter, 539 U.S. at *1212 334, 123 S.Ct. 2325. The racial tiebreaker fails that test.
Yet the majority insist that because the District seeks to avoid racially concentrated schools, “the District’s tiebreaker must necessarily focus on the race of its students.” Majority op. at 1183. Again, the majority misses the crucial protection provided by the Equal Protection Clause. The District’s narrow-tailoring obligation does not prohibit it from considering race; it just cannot consider only race. The constitutional guarantee of equal protection requires the District to focus upon the individual’s whole make up, rather than just a group’s skin color; this protects each student’s right to equal protection under the law. See Grutter, 539 U.S. at 326, 123 S.Ct. 2325.
The counter-argument, of course, is that administrative inconveniences would prohibit the District from examining each student’s file for individual characteristics, of which race may be a part. To the contrary, the record shows such an effort is certainly feasible.
First, thirteen- or fourteen-year-old students [19] are not so young that they have not yet developed unique traits to set themselves apart from other students and add greater diversity to the student body. The students’s race is a factor in assessing the student as an individual, but the student may also speak English as a second language, come from a different socioeconomic stratum than other students, have overcome adversity, be a talented baseball player, musician, or have participated in community service.
Second, as noted by the majority, in the 2000-01 school year, approximately 3,000 students entered the District’s high schools as ninth graders. Ten percent of those students were subject to the racial tiebreaker. Majority op. at 1170. Thus, under an individualized approach, the District would have had to examine only three hundred applications to determine who to admit to the oversubscribed schools. Instead, the District grouped those three hundred students into white and nonwhite categories and allowed a computer to select their assignment based solely upon their race.[20]
Thus, rather than providing an individualized consideration of applicants, the District is engaged in a “de jure [policy] of automatic acceptance or rejection based on a[] single ‘soft’ variable.” See Grutter, 539 U.S. at 337, 123 S.Ct. 2325. Such inflexibility shows the racial tiebreaker is not “narrowly tailored to any goal, except perhaps outright racial balancing.” See Croson, 488 U.S. at 507, 109 S.Ct. 706 (plurality).
B.
The second narrow-tailoring factor prohibits the use of quotas based upon race. Grutter, 539 U.S. at 334, 123 S.Ct. 2325. A quota is defined as “a program in which a certain fixed number or proportion of opportunities are reserved exclusively for certain minority groups. Quotas impose a fixed number or percentage which must be attained, or which cannot be exceeded.” Id. at 335, 123 S.Ct. 2325 (internal quotation marks and citations omitted).
*1213 Here, when a District school is oversubscribed and “integration positive” — ie., the white or nonwhite student body of the school deviates by plus or minus 10% or 15% (depending on the school year)[21] of the preferred 40% white/60% nonwhite ratio — the District uses the racial tiebreaker to admit students whose presence will move the overall student body closer to the preferred ratio. Using the 2000-2001 school year as an example, the District would employ the racial tiebreaker to exclude white students and admit nonwhite students where the white student body population exceeded 50%. The District would also employ the racial tiebreaker to exclude nonwhite students and admit white students where the nonwhite student body population in a particular school exceeded 70%.
By its nature, the tiebreaker aims for a rigid, predetermined ratio of white and nonwhite students, and thus operates to reach “a fixed number or percentage.” (emphasis supplied). Grate specifically rejected such a plan as not narrowly tailored. See 539 U.S. at 270, 123 S.Ct. 2411 (“[T]he University’s policy, which automatically distributes [20%] ... of the points needed to guarantee admission, to every single ‘underrepresented minority’ applicant solely because of race, is not narrowly tailored ....”); id. at 271-72, 123 S.Ct. 2411 (“The only consideration that accompanies this distribution of points is a factual review of an application to determine whether an individual is a member of one of these minority groups.”).
Yet the majority argues no quota exists here because the racial tiebreaker “does not set aside a fixed number of slots for nonwhite or white students,” nor is the 10 or 15% variance always satisfied (generally because there are insufficient numbers of white or nonwhite students needed to balance the school). Majority op. at 1185.[22] With respect, the majority misses the point. A quota does not become less of a quota because there are an insufficient number of whites or nonwhites to fill the preselected spots. The District created a quota when it established the predetermined, preferred ratio of white and nonwhite students. In Bakke, the medical school argued that it did not operate a quota in its admissions system because it did not always fill the preselected seats; thus, its admissions system only had a “goal.” Justice Powell rejected that argument, stating that regardless of whether the preselected seats were a “quota” or a “goal,” such a
semantic distinction is beside the point: The special admissions program is undeniably a classification based on race and ethnic background. To the extent that there existed a pool of at least minimally qualified minority applicants to fill the 16 special admissions seats, white applicants could compete only for 84 seats in the entering class, rather than the 100 open to minority applicants. Whether this limitation is described as a quota or a goal, it is a line drawn on the basis of race and ethnic status.
*1214 Bakke, 438 U.S. at 289, 98 S.Ct. 2733 (Powell, J.).
The majority makes a further attempt to avoid Grutter’s admonition against quotas by attempting to classify the District’s predetermined ratio as a “critical mass.” The District’s preferred ratio could not be further from the definition of a “critical mass.” Grutter recognized that a “critical mass” had no quantified definition; instead, it was generally referred to as “meaningful numbers” or “meaningful representation” of minorities. 539 U.S. at 318, 123 S.Ct. 2325. The Court expressly stated that a “critical mass” was not a means “simply to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin.” Id. at 329, 123 S.Ct. 2325 (internal quotation marks omitted).
But unlike the unquantified “critical mass” from Grutter, the District’s preferred ratio is firmly set at 40% white, 60% nonwhite. When the 15% deviation trigger is used with the racial tiebreaker, the District seeks to enroll between 75% and 45% nonwhite students and 25% to 55% of white students. The District’s admissions plan clearly seeks to assure a specified percentage of white or nonwhite students in its schools; rather than seeking a “critical mass,” the District instead seeks racial balance. Thus, the District’s operation of the racial tiebreaker fails this factor as well.
c.
The third narrow-tailoring factor requires the District to have engaged in a “serious, good-faith consideration of workable race-neutral alternatives.” See id. at 339, 123 S.Ct. 2325. The majority concludes the District made such an effort. Majority op. at 1188. For several reasons, I disagree.
First, the District’s superintendent flatly admitted the District did not engage in a serious, good-faith consideration of race-neutral alternatives. When asked whether the District “g[a]ve any serious consideration to the adoption of a plan for the assignment of high school students that did not use racial balancing as a factor or goal,” the District’s superintendent stated: “I think the general answer to that question is no ... I don’t remember a significant body of work being done. I mean it’s possible informally ideas were floated here or there, but I don’t remember any significant staff work being done.” [ER 521.]
The record supports this concession. The District never asked its demographer to conduct any analysis regarding the effect of using a race-neutral lottery. [ER 483.] The District also never asked its demographer to conduct any analysis regarding a diversity program with non-racial indicia such as a student’s eligibility for free lunch or the students’s socioeconomic background.[23] [ER 481-82.]
*1215 Also, in 2000, the Urban League of Metropolitan Seattle presented a high school assignment plan to the District. The plan proposed that each neighborhood region in Seattle would have a designated high school. Students would still be able to apply to any high school in Seattle, but when oversubscription occurred, students living in the designated “reference area” would first be assigned to their regional high school ahead of those who did not. To avoid racial concentration in the schools, the plan proposed “merit-based academic, avocational and vocational magnet programs.” These programs “will help each school address racial diversity issues by encouraging students to travel outside of their communities to participate in a specific magnet program.”[24]
Despite the majority’s assertion, the record suggests the District did not seriously consider this plan. The District did not ask its demographer to conduct any analysis as to the effect or workability of the plan [ER 504]; one District board member *1216 stated the District “didn’t deal with” the plan [ER 514]; another board member stated the District didn’t consider the plan [ER 643]; and last, another board member stated he refused to read the proposal because he would “rather play with my bass lunker fishing game.” [ER 573.]
Of course, “[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative,” Grutter, 539 U.S. at 339, 123 S.Ct. 2325, but it does require an earnest, good-faith consideration of the alternatives. Here, the District made no such attempt, and thus the District’s use of the racial tiebreaker fails this narrow-tailoring factor.[25]
D.
The fourth narrow-tailoring factor requires that the District’s use, of the racial tiebreaker “must not unduly burden individuals who ’are not members of the favored racial and ethnic groups.” See Grutter, 539 U.S. at 341, 123 S.Ct. 2325. The. majority adjusts this test slightly to consider “any racial group,” rather than just members of the disfavored group. Majority op. at 1180. Because the racial tiebreaker disadvantages both white and nonwhite children, I agree that the modification is valid. But unlike the majority, I conclude the District’s operation of the racial tiebreaker fails this factor as well.
The racial tiebreaker unduly burdens thirteen- and fourteen-year-old school children by (1) depriving them of their choice of school, and (2) imposing on them tedious cross-town commutes, solely upon the basis of their race.
First, as recognized above, the “good” schools in Seattle are a limited government benefit. Thus, the racial tiebreaker burdens white or nonwhite students, and often deprives them of the opportunity to enroll at what are considered the better schools, solely on the basis of race.
Second, the children of plaintiff members Jill Kurfurst and Winnie Bachwitz were denied admission to Ballard High School based, on their race and instead were forced to attend Ingraham, a school on the other side of Seattle from their home. To attend that school, the two white students faced a daily multi-bus round-trip commute of over four hours. The parents instead enrolled their children in private schools. Those children were not only deprived of the school of their choice, they were effectively denied a public education (surely at much lower cost than private tuition), based on nothing but their race.
A look at the operation of the tiebreaker provides further evidence of the injury the District inflicts on both white and nonwhite students. As noted by the majority, *1217 in the 2000-01 school year, 89 more white students were assigned to Franklin than would have occurred absent the tiebreaker; 107 more nonwhite students were admitted to Ballard; 82 more nonwhite students were admitted to Roosevelt; and Twenty-seven more nonwhite students were admitted to Nathan Hale. Majority op. at 1170. To place the racial tiebreaker into proper perspective, in the 2000-01 school year, 89 nonwhite, minority students were denied admission to Franklin, and had to attend what to them was a less desirable school, solely because of their skin color. One hundred-seven white students were denied admission to Ballard, and had to attend what to them was a less desirable school, solely because of their skin color. Eighty-two white students were denied admission to Roosevelt, and had to attend what to them was a less desirable school, solely because of their skin color. Twenty-seven white students were denied admission to Nathan Hale, and had to attend what to them was a less desirable school, solely because of their skin color.
Yet the majority discounts the burdens imposed by the racial tiebreaker, concluding that (1) the “minimal burden” of the tiebreaker is shared equally among white and nonwhite students; (2) no student is entitled to attend any specific school in any event; and (3) the tiebreaker does not uniformly benefit one race over the other because the tiebreaker operates against both whites and nonwhites. Majority op. at 1191 -1192. Regarding the first point, the U.S. Supreme Court has long rejected the notion that a racial classification which burdens races equally is any less objectionable under the Equal Protection Clause. In Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), the U.S. Supreme Court held a Virginia statute criminalizing interracial marriages was unconstitutional under the Equal Protection Clause. Id. at 12, 87 S.Ct. 1817. The Court rejected the state’s argument that the miscegenation statute did not discriminate on the basis of race because it “punish[ed] equally both the white and the Negro participants in an interracial marriage.” Id. at 8, 87 S.Ct. 1817. The Court reasoned: “In the case at bar ... we deal with statutes containing racial classifications, and the fact of equal application does not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race.” Id. at 9, 87 S.Ct. 1817. Hence, it is irrelevant whether the racial tiebreaker disadvantages both races equally.
Second, I think I have already disposed of the majority’s argument that no student is entitled to attend any specific District school. The students and parents clearly value some of the District’s schools above the others, and limiting access to those higher quality schools on the basis of race is just the same as any other preferential racial classification.
Third, I agree the tiebreaker does not uniformly benefit one race over the other and can exclude both white and nonwhite students from the preferred schools. Yet that does not lessen the injury of being subject to a racial classification. Equal protection is an individual right, and whenever the District tells one student, whether white or nonwhite, he or she cannot attend a particular school on the basis of race, that action works an injury of constitutional proportion. See Adarand, 515 U.S. at 230, 115 S.Ct. 2097 (“[A]ny individual suffers an injury when he or she is disadvantaged by the government because of his or her race, whatever that race may be.”); Monterey Mech. Co., 125 F.3d at 712 (“Race discrimination is never a ‘trifle.’ ”).
The District’s use of the racial tiebreaker thus unduly burdens members of the disfavored class, and the tiebreaker fails this narrow-tailoring factor as well.
*1218 E.
The fifth and final narrow-tailoring factor requires the District’s use of the racial tiebreaker to “be limited in time,” and “have a logical end point.” See Grutter, 539 U.S. at 342, 123 S.Ct. 2325. A workable “sunset” provision within any government-operated racial classification is vital:
[A] core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race.... The requirement that all race-conscious admissions programs have a termination point assures all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself.
Id. at 341-42, 123 S.Ct. 2325 (internal quotation marks and alterations omitted).
Citing Grutter, the majority contends the racial tiebreaker satisfies this factor because “this durational requirement can be met by periodic reviews to determine whether racial preferences are still necessary to achieve student body diversity,” and the District engages in such periodic reviews. Majority op. at 1192. Yet citing Grutter in full shows that “the durational requirement can be met by sunset provisions in race-conscious admissions policies and periodic reviews to determine whether racial preferences are still necessary to achieve student body diversity.” 539 U.S. at 342, 123 S.Ct. 2325 (emphasis added). Periodic reviews are not enough; there must be some “durational requirement,” some “logical end point,” to the racial classifications.
The District argued the end point is in the “thermostat” to the tiebreaker, in which the District ceases to use the racial tiebreaker at any school for the year once its use had brought the school into racial balance. Yet it is undisputed that the District has never been segregated by law; the racial imbalance in its schools results from Seattle’s racially imbalanced housing patterns. If Seattle’s children were simply assigned to the high schools nearest their homes, those schools supposedly would tend to reflect such imbalance.
Because there is no reason — much less evidence — to conclude Seattle’s housing patterns will change, or that the District’s student assignment program will affect such patterns, I must respectfully disagree that such a provision satisfies the “sunset provision” requirement enunciated in Grutter. Presumably, where the District employs the racial tiebreaker, the schools will become racially balanced, that is 40% white, 60% nonwhite (plus or minus a few percentage points, depending on the particular percentage deviation triggering the tiebreaker that year). Pursuant to the “thermostat,” the District would then stop using the racial tiebreaker. But because Seattle’s residential makeup is racially imbalanced [26] (and remains so despite the use of the racial tiebreaker), assignment to the oversubscribed schools would then occur only with use of (1) the sibling tiebreaker; and (2) the distance tiebreaker. Assuming that not every student also has a sibling attending one of the District’s schools, the schools will inevitably become racially imbalanced again because of the racially imbalanced residential makeup, thus rendering the thermostat useless as a “sunset provision.”
One could argue, then, that this result supports the need for use of the racial tiebreaker. Not necessarily so. If the racial imbalance in the schools is caused *1219 not by the students, but by the choices of the parents as to where to live, then why not put the onus of remedying that imbalance on the parents rather than the students? Seattle’s city council could create “incentives” for whites to move into nonwhite areas, and for nonwhites to move into white areas. And if incentives do not accomplish the task, well, why not use compulsion, as the District does to high school children? The city council could take measures to prevent new persons taking up residence in Seattle from living in areas where their presence might otherwise alter the sought-after racial balance. This would protect the racial balance within the schools and squarely put the burden of remedying the racial imbalance upon the parents, rather than the students.
Of course, less political resistance can be expected from choosing students for social engineering experiments in racial balancing, than in telling everyone — including voters — into which neighborhood they can move. Further, regulation of residence by race might run afoul of Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), although it is difficult to distinguish why the “compelling interest” of socialization among the races could not as easily be pressed in housing regulation as it is in schooling regulation.
The simple truth is that some people choose to live near members of their own ethnic or racial group.
There is no denying that American blacks often live in their own residential enclaves, especially in our big cities. But the same is true of whites and of every other racial and ethnic group— Jews, Chinese, Cambodians, Cubans, Arabs. Such racial and ethnic clustering means that a third of non-Asian minorities attend schools that are less than 10-percent white. And even though whites constitute just over 60 percent of the nation’s schoolchildren, the average white student goes to a school that is 80-percent white.
But why should we expect identical proportions of blacks and whites to live in each and every neighborhood? People like to live near others with whom they identify, and the schools mirror their choices. When asked about their residential preferences, only about 5 percent of blacks said they wished to live on an entirely or almost entirely white block. The vast majority preferred neighborhoods that were half or more than half African-American — -in other words, neighborhoods in which the black concentration was “disproportionately” high. According to the 2000 census, this happens to correspond closely to the actual distribution of black city-dwellers.
In a complex, heterogenous society, it is only natural that people should sort themselves out in urban space along lines of race as well as of religion and social class. This pattern was firmly established in the U.S. by the European immigrants who landed in the cities of the North in the 19th and early 20th centuries. The sociologists who studied these settlements recognized the important social functions served by “Little Italies” and “Poletowns”.
Abigail Thernstrom[27] & Stephan Thernstrom, Have We Overcome?, Commentary, Nov. 2004, at 51-52.[28]
Of course, the continuing racial imbalance in some residential areas is in signifi *1220 cant part a byproduct of past efforts to exclude minority groups from predominately white areas. Yet as racial tolerance and enforcement of civil rights laws have increased, neighborhoods are becoming more racially balanced. Id. In 1960, 15% of African-Americans lived in suburbs. In 2004, 36% live in suburbs. Id. African-Americans account for 9% of the total suburban population, “surprisingly close to proportionality for a group that constitutes only 12 percent of the American population.” Id. Moreover, from 1960 to 2000, the proportions of African-American living in census tracts that were over 80% black fell from 47% to under 30%. Id. During that same period, the proportion residing in census tracts that were over 50% black fell from 70% to 50%. Id. Most importantly, this balancing takes place without any government coercion, except perhaps by the enforcement of fair housing laws which prevent racial discrimination such as California’s Unruh Civil Rights Act, Cal. Civ. Code § 51 (West 2001).
No one who understands what makes America great can quarrel with ethnic pride. At home, on the weekend, in the family and the neighborhood, Jews will be Jews, Italians Italian — and there is no reason blacks should be any different. Religion and ethnicity are essential parts of our lives, and government should not curtail how we express them in the private sphere. But when it comes to public life, even the benevolent color coding of recent decades has proved a recipe for alienation and resentment. Society need not be colorblind or color-less, but the law cannot work unless it is color-neutral, and the government should not be in the business of abetting or paying for the cultivation of group identity.
Schuck, supra, at 88 (quoting Tamar Jacoby, Someone Else’s House: America’s Unfinished Struggle for Integration 541 (1998)) (internal alteration omitted).
The racial imbalance in Seattle’s schools results not from de jure segregation nor from any invidious exclusion of nonwhite minorities from the schools. Instead, it results from racially imbalanced residential housing patterns, an issue which the District does not even contend it can alter. Hence, the method chosen by the District to impose racially balanced schools is fatally flawed. Because it does not respond to the racial imbalances in Seattle’s residential makeup, and instead only attempts to fix it within the schools, there will be no sunset to the use of the racial tiebreaker. See Grutter, 539 U.S. at 343, 123 S.Ct. 2325 (“It would be a sad day indeed were America to become a quota-ridden society, with each identifiable minority assigned proportional representation in every desirable walk of life. But that is not the rationale for programs of preferential treatment; the acid test of their justification will be their efficacy in eliminating the need for any racial or ethnic preferences at all.”). Thus, the District’s operation of the racial tiebreaker fails this factor as well.
V.
As pointed out in the majority opinion, other courts have concluded that a school district’s use of a racial tiebreaker in search of racial balance in the student body passes muster under the Equal Protection Clause.[29] I respectfully disagree. *1221 The District’s use of the racial tiebreaker to achieve racial balance in its high schools infringes upon each student’s right to equal protection and tramples upon the unique and valuable nature of each individual. We are not different because of our skin color; we are different because each one of us is unique. That uniqueness incorporates our opinions, our background, our religion (or lack thereof), our thought, and our color. Grutter attempted to strike a balance between the individual protections of equal protection and being conscious of race even when looking at the individual. The District’s use of the racial tiebreaker, however, attempts no such balance; it instead classifies each ninth-grade student solely by race. Because of that, I must conclude such a program violates the Equal Protection Clause.
The majority’s decision risks unfortunate repercussions. On the short-term, the specter of “white flight” (a recurring issue in the aftermath of the elimination of de jure desegregation) manifests itself here. The racial balancing of students will require busing and long-distance transportation to schools outside of some students’ neighborhoods. Parental involvement in those distant schools (such as with the PTA) will undoubtedly decrease. Parents who can afford private education (such as those in the more affluent northern part of Seattle) may very well choose to pull their children from the District schools and enroll them elsewhere, much like the Kur-furst and Baehwitz children. On the long-term, such an exodus could result in a decreased tax base and public support for the District schools and may result in the exact opposite the District hopes to achieve-a loss of white students from their school campuses.
One of the greatest stains upon the history of our country is our struggle with race discrimination. Perhaps that stain would not be so deep had we chosen a different approach to our equal protection jurisprudence, an approach often-quoted:
Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved.
Plessy v. Ferguson, 163 U.S. 537, 559, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (Harlan, J., dissenting).
Or, as more recently said by the late Justice Stanley Mosk of the California Supreme Court:
Racism will never disappear by employing devices of classifying people and of thus measuring their rights. Rather, wrote Professor Van Alstyne, ‘one gets beyond racism by getting beyond it now: by a complete, resolute, and credible commitment [njever to tolerate in one’s own life or in the life or practices of one’s government the differential treatment of other human beings by race. Indeed, that is the great lesson for government itself to teach: in all we do in *1222-1240 life, whatever we do in life, to treat any person less well than another or to favor any more than another for being black or white or brown or red, is wrong. Let that be our fundamental law and we shall have a Constitution universally worth expounding.’
Price v. Civil Serv. Comm., 26 Cal.3d 257, 161 Cal.Rptr. 475, 604 P.2d 1365, 1391 (1980) (Mosk, J., dissenting) (quoting William Van Alstyne, Rites of Passage: Race, the Supreme Court, and the Constitution, 46 U. Chi. L.Rev. 775, 809-10 (1979)).
The way to end racial discrimination is to stop discriminating by race.
For the reasons expressed above, I respectfully dissent and would reverse the judgment of the district court, holding the District’s use of the racial tiebreaker in its high school admissions program violates the equal protection rights of each student excluded from a particular school solely on the basis of that student’s race.

. For a dissenting view, see infra pp. 1204-1205.

. Because of our country's struggle with racial division and the injustices of compelled government de jure segregation, we must be especially suspicious of any compulsive government program based upon race, even when such a program is supposedly beneficial. Good intentions cannot insulate the government's use of race from the commands of the Equal Protection Clause; history is rife with examples of well-intentioned government programs which later caused grievous harm to society and individuals. See Adarand Constructors v. Pena, 515 U.S. 200, 226, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) ("More than good motives should be required when government seeks to allocate its resources by way of an explicit racial classification system."); Olmstead v. United States, 277 U.S. 438, 479, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandéis, J., dissenting) ("Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. ... The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.”).

. This makes all the more puzzling the majority’s assertion that "that the District has a compelling interest in securing the educational and social benefits of racial (and ethnic) diversity.” Majority op. 1166 (emphasis added). There simply is no ethnic tiebreaker.

. Remediation of de jure segregation is not at issue here; the parties concede the District’s schools have never been de jure segregated. No one even suggests that Seattle’s housing market has ever been affected by de jure segregation.

.Indeed, the term "de facto segregation” is somewhat of an oxymoron. That is perhaps why the Supreme Court preceded the term with the qualifier "so-called.” See Keyes, 413 U.S. at 208, 93 S.Ct. 2686.

. See Comfort v. Lynn Sch. Comm., 418 F.3d 1, 27 (1st Cir.2005) (Boudin, C.J., concurring).

. Id.

. Concurrence at -(citing Comfort, 418 F.3d at 27 (Boudin, C.J., concurring)).

. See infra pp. 1212 - 1214 (discussion of why the racial tiebreaker used by Seattle is a quota).

. What is "the reality” or "realistic” or "real-world” is usually a rhetorical tool for dressing up one's own view as objective and impartial, and therefore, more presentable.

. See e.g. Adarand, 515 U.S. at 224, 115 S.Ct. 2097, Gratz v. Bollinger, 539 U.S. 244, 270, *1199 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003), Johnson v. California, - U.S. -, 125 S.Ct. 1141, 1146, 160 L.Ed.2d 949 (2005). On this point, the majority agrees. See Majority op. pp. 1172 n. 12.

. The majority cites often to Grutter’s statement that "context matters” in reviewing racial classifications under the Equal Protection Clause. See 539. U.S. at 327, 123 S.Ct. 2325 (“Context matters when reviewing race-based governmental action under the Equal Protection Clause.”). There, the Court counseled that strict scrutiny was to take "relevant differences” into account. Id.
Indeed, "context” does matter; context always matters in the application of general rules of law to varied factual settings. See Gomillion v. Lightfoot, 364 U.S. 339, 343-44, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) ("Particularly in dealing with claims under broad provisions of the Constitution, which derive content by an interpretive process of inclusion and exclusion, it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts.”). In Grutter, the “context” was a public law school's race-conscious, individualized consideration of applicants for purposes of admissions, designed to achieve diversity. Here, the context is different; we consider a rigid racial tiebreaker, which considers only race, designed to avoid racial imbalance in the schools. And so, as we do for all cases, we look to general principles of law and apply them through the correct standard of review, cognizant of the different results reached in other cases because of different facts and the "context” in which the cases *1202 arose. But what must be remembered is that a different "context" does not change the general rules of law, nor does a different "context” change the applicable standard of review (at least for government-imposed racial classifications).
Yes, "context” matters, but the mention of "context” should not be a talisman to banish further enquiry. The "context” of the Michigan Law School is different from the District’s schools. But the difference is in the age of the students, their number and the obligation of the District to admit all students. Does that change the fact that some students are sent to certain schools solely because of their races? How does "context” change that? Let us not succumb to the use of an abstraction ("context”) to invoke "sensitivity” to “nuances,” thus to attempt to change the bald fact of selection based on race.

. The majority fails to recognize this distinction. For example, comparing the District's claimed interest with those endorsed in Grut-ter, the majority reasons high schools "have an equal if not more important role” in preparing students for work and citizenship, and concludes “it would be a perverse reading of the Equal Protection Clause that would allow a university, educating a relatively small percentage of the population, to use race when choosing its student body but not allow a public school district, educating all children attending its schools, to consider a student's race in order to ensure that the high schools within the district attain and maintain diverse student bodies.” Majority op. at 1175, 1176. *1203 Yet Grutter did not allow universities to consider race in admissions to achieve racial balancing. The whole point of Grutter and Gratz was that universities may consider race, but only as part of the overall individual. I see nothing perverse in recognizing the Equal Protection Clause to be the protector of the individual, whether he be among the few at an elite law school, or among the many in a public high school.

. Again, there is nothing illegal in freely choosing to believe in this stereotype and to act upon it as a private citizen in sending one's child to a particular school. The case changes when such racial stereotype is accepted by the state, and is the basis for the imposition of racial discrimination.

. The majority notes that for purposes of the racial tiebreaker, “a student is deemed to be of the race specified in his or her registration materials.” Majority op. at 1169. That generalization declines to note a particularly overbearing facet of the racial tiebreaker. Although the District encourages the students’ parents to identify the race of their student in the registration materials, if a parent or student chooses to follow the example of Tiger Woods and refuses to identify his or her race, the District then engages in a visual inspection of the student or parent and will decide the child's color notwithstanding the parent's or student’s choice.

. See also David J. Armor & Christine H. Rossell, Desegregation and Resegregation in the Public Schools, in Beyond the Color Line: New Perspectives on Race and Ethnicity in America 251 (Abigail Thernstrom & Stephan Thernstrom eds., 2002) ("[Rjacial composition by itself has little effect on raising the achievement of minority students or on reducing the minority-white achievement gap. Some studies show that there is no relationship at all between black achievement and racial composition ..., and other studies show that there is no relationship between the black-white achievement gap and racial composition. In either case, though there is some evidence here that achievement can be affected by programmatic changes, there is no evidence that it responds to improved racial balance by itself.”); id. at 252 (“The evidence on the benefit of school desegregation for race relations is probably the weakest of all. Indeed, there are more studies showing harmful effects than studies showing positive effects.” This led to another and more recent reviewer of the race relations literature to conclude, somewhat generously: “ 'In general, the reviews of desegregation and intergroup relations were unable to come to any conclusion about what the probable effects of desegregation were.... Virtually all of the reviewers determined that few, if any, firm conclusions about the impact of desegregation on inter-group relations could be drawn. The reluctance of reviewers to draw conclusions about the benefits of school desegregation for race relations or self-esteem only reinforces our conclusion that the psychological harm theory of de facto segregation and the social benefit theory of desegregation are clearly wrong, at least when applied to desegregation as a racial balance policy.' ”).

. The majority states that Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), supports the proposition that the District has broad discretion to engage in racial balancing as an "educational policy.” In Swann, the Supreme Court stated: "School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court.” Id. at 16, 91 S.Ct. 1267; see also North Carolina State Bd. of Educ. v. Swann, 402 U.S. 43, 45, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971) (same, citing Swann, 402 U.S. at 16, 91 S.Ct. 1267).
Swann’s passage seems to provide powerful language for the majority’s position, but alas, the majority takes the passage out of context. Swann considered the remedies available to a federal court to combat past de jure segregation. The Court never considered whether a school district could use racial classifications to achieve racial balance absent de jure segregation. Indeed, the Court stated: "We are concerned in these cases with the elimination of the discrimination inherent in the dual school systems, not with myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious, or ethnic grounds.... Our objective in *1209 dealing with the issues presented by these cases is to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race; it does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools.” Id. at 22-23, 91 S.Ct. 1267 (emphasis added).
Swann was also decided decades before the Court resolved the issue of the level of scrutiny to apply to "benign” racial classifications, vis-a-vis "invidious” racial classifications.
Thus, Swann’s dictum cannot shelter the District's use of the racial tiebreaker from the searching inquiry required by strict scrutiny.
The majority similarly errs in relying on Washington v. Seattle Sch. Dist. No. 1, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982). There, the Court also specifically stated it did not reach the issue of the constitutionality of "race-conscious student assignments for the purpose of achieving integration, even absent a finding of prior de jure segregation.” Id. at 472 n. 15, 102 S.Ct. 3187.

. See supra pp. 1201-1202 n. 12 (explaining why the talismanic use of ''context” can not alter the fact of racial discrimination).

. As noted, the District applies the racial tiebreaker only to entering ninth-grade students (presumably around thirteen to fourteen years old).

. Three hundred applications seem like only a minor administrative challenge, but the Supreme Court’s admonition bears repeating nonetheless: "[T]he fact that the implementation of a program capable of providing individualized consideration might present administrative challenges does not render constitutional an otherwise problematic system.” Gratz, 539 U.S. at 275, 123 S.Ct. 2411.

. In 2000-01, the District used a 10% deviation trigger, but increased the trigger to 15% for the 2001-02 school year.

. Although the majority concludes a quota does not exist here, it also concludes “the rationale underlying the ... prohibition of quotas does not apply” here. Majority op. at 1184 n. 27. The majority reasons that because there is no competition in assignment to the District's schools, the dangers presented by a quota — i.e., insulating applicants from competition on the basis of race — are absent here. Majority op. at 1184 n. 27. But saying it does not make it so, whether it is said by the District or by the majority. As explained above, there is clearly a “market” for higher quality schools in the District, and there is competition for the schools the parents and students view to be the better schools.

. The majority makes the conclusory statement that the District’s "white/nonwhite distinction is narrowly tailored to prioritize movement of students from the north of the city to the south of the city and vice versa” as an effort to combat Seattle’s racially imbalanced residential patterns. Majority op. at 1188. Yet the District’s attempt to balance students from north Seattle and south Seattle strongly suggests a less-restrictive, race-neutral approach to achieve such balancing: socioeconomic balancing. As the majority notes, the northern Seattle area contains a majority of "white” students and is "historically more affluent.” Majority op. at 1166. This would mean the southern Seattle area is less affluent. Thus, moving more affluent students south, and less affluent students north, could possibly provide a more diverse student body. At the very least, serious consideration would have been warranted into this race-neutral alternative. See Levine, supra, at 536 (noting the key element to successfully integrating students of different backgrounds and *1215 race is not racial balance, but “economic integration”).
Yet the majority accepts the District's rejection of the use of socioeconomic factors, reasoning that “[a]lthough there was no formal study of the proposal by District staff, Board members’ testimony revealed two legitimate reasons” for rejecting the socioeconomic alternative: (1) “it is insulting to minorities and often inaccurate to assume that poverty correlates with minority status;” and (2) students would be reluctant to reveal their socioeconomic status to their peers. Majority op. at 1189. Such analysis seems far from the "serious, good-faith consideration of workable race-neutral alternatives” demanded by Grutter. See 539 U.S. at 339, 123 S.Ct. 2325. First, without formal studies (or indeed any earnest consideration of the alternatives), we have no way of knowing whether the District actually seriously considered, and rejected for valid reasons, less-restrictive race-neutral alternatives. In Croson, the Court emphasized the importance of a satisfactory record to determine whether race-neutral alternatives were considered. See Croson, 488 U.S. at 498-511, 109 S.Ct. 706 (plurality) (detailing the government actor’s failure to document the basis for its use of a racial quota and stressing the need to do so). Second, the majority’s insistence that the District’s consideration of poverty would be “insulting” ignores the demeaning — and indeed, constitutionally objectionable — effect of placing persons into groups solely by their skin color for the purpose of receiving or being denied a governmental benefit. See Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) ("[T]his Court has consistently repudiated distinctions between citizens solely because of their ancestry as being odious to a free people whose institutions are founded upon the doctrine of equality.”). Even if a sole focus on poverty might be insulting to some minorities, socioeconomic considerations need not inquire only into poverty status; eligibility for free lunch, the parents' levels of education, or whether English is a second language for the child are also relevant determinations in evaluating diversity. Third, there is no reason students would have to reveal their socioeconomic status to their peers; the District could, of course, keep such information confidential.

. Similar race-neutral alternatives are common throughout the United States. For example, the San Francisco, California public school district employs a program focused on enhancing diversity in the classrooms. The program allows students to choose any school within the district. When a school is oversubscribed, the program first assigns students with siblings to the same school, and then accommodates students with specialized learning needs. After that, the “Diversity Index” handles further assignments. "Under the Diversity Index process, the school district calculates a numerical profile of all student applicants. The current Diversity Index is composed of six binary factors: socioeconomic status, academic achievement status, mother's educational background, language status, academic performance index, and home language.” David I. Levine, Public School Assignment Methods after Grutter and Gratz: The View from San Francisco, 30 Hastings Const. L.Q. 511, 528-31 (2003). Notably, the San Francisco system “does not use race as an express criterion for school assignments” and thus avoids the sharp focus of strict scrutiny. Id. at 531.

. In assessing whether the District seriously considered race-neutral alternatives, the majority applies deference to the District's consideration (or lack thereof) and rejection of the various alternatives. Majority op. at 1188 n. 33. With respect, the majority errs in two respects. First, as previously noted, deference to local officials' use of race is generally barred in the application of strict scrutiny. See Johnson, 125 S.Ct. at 1146 n. 1. Second, if the majority is attempting to apply the deference invoked in Grutter, the Court there applied deference in determining whether the Law School asserted a compelling governmental interest, not whether the means used to achieve that interest were narrowly tailored. See 539 U.S. at 328, 123 S.Ct. 2325 ("The Law School’s educational judgment that such diversity is essential to its educational mission is one to which we defer.").
The pattern now established by the majority seems suspicious. Out of five narrow-tailoring factors, the majority has concluded two are inapplicable, and now a third is entitled to deference. I find it difficult to understand how such analysis could truly be considered strict scrutiny as to the narrowing requirement.

. About 70% of the residents of Seattle, Washington are white, and 30% of the residents are nonwhite. Sixty-six percent of white students live in the northern part of Seattle, while 75% of nonwhite students live in the southern part of Seattle.

. Mrs. Thernstrom is presently the Vice Chair of the U.S. Commission on Civil Rights.

. Further evidence that such self-selection results is submitted by this year's Nobel Laureate, Thomas C. Schelling, by application of game theory in chapter four of his book Mi-cromotives and Macrobehavior (1978). Schelling employs an exercise using coins to demonstrate how an integrated neighborhood *1220 can become largely segregated as long as each resident desires at least one third of his or her neighbors to be of his or her race. When one person moves to get a preferred set of neighbors, it causes a chain reaction which settles down only when the neighborhood is effectively segregated.

. Cf. Comfort v. Lynn Sch. Comm., 418 F.3d 1, 5 (1st Cir.2005) (en banc) (holding a public high school district had a compelling interest, *1221 in the absence of de jure segregation, in using race-based assignments to “secur[e] the educational benefits of racial diversity,” and the means used to serve that interest were narrowly tailored); McFarland v. Jefferson County Pub. Sch., 330 F.Supp.2d 834, 850 (W.D.Ky.2004) (holding a public high school district had a compelling interest in using race-based assignments to maintain racially integrated schools, and the means used to serve that interest were narrowly tailored), aff’d, 416 F.3d 513 (6th Cir.2005); Brewer v. W. Irondequoit Central Sch. Dist., 212 F.3d 738, 752 (2d Cir.2000) (holding a public middle school district had a compelling interest, in the absence of de jure segregation, in using race-based assignments to reduce "racial isolation” in its schools).